BROWN, Circuit Judge,
concurring in part:
“If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality ... unless such adjudication is unavoidable.” Spector Motor Serv. v. McLaughlin, 323 U.S. 101, 105, 65 S.Ct. 152, 89 L.Ed. 101 (1944). “Thus, if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter.” Ashwander v. TVA, 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandéis, J., concurring). Because these regulations must be vacated as contrary to the statute, we need not and should not reach the First Amendment issue. But if we’re going to answer an unnecessary constitutional question, we at least ought to get it right. In light of McConnell v. FEC, 540 U.S. 93, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003), I have grave doubts about the court’s analysis, which bears at most a passing resemblance to the parties’ briefs, and which will profoundly affect campaign finance law in this circuit. I thus respectfully concur only with Part IV of the court’s opinion, except for footnotes 17, 18 and 20.
I.
A.
Though I do not join their First Amendment holding, I agree with my colleagues’ conclusion that we must vacate the regulations challenged here (the Multiple Candidate Allocation Regulation, 11 C.F.R. § 106.6(f); the Solicitation Regulation, 11 C.F.R. § 100.57; and the Administrative Costs Allocation Regulation, 11 C.F.R. § 106.6(c)). I begin with first principles. The Federal Election Commission (FEC) is an agency within the Executive Branch. *26 The Executive Branch cannot make law, but instead executes laws enacted by the Legislative Branch. In executing the law, the FEC may issue “necessary” rules, 2 U.S.C. § 437d.(a)(8), but, as with all agencies, the FEC acts contrary to law if it promulgates regulations “in excess of [its] statutory jurisdiction,” 5 U.S.C. § 706(2)(C). See also La. Pub. Serv. Comm’n v. FCC, 476 U.S. 355, 374, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986) (“[A]n agency literally has no power to act ... unless and until Congress confers power upon it.”).
By the plain language of the Federal Election Campaign Act (FECA), the FEC lacks the power it now asserts. To fall within FEC jurisdiction, a “gift, subscription, loan, advance, or deposit of money or anything of value” must be provided to a political committee “for the purpose of influencing any election for Federal office,” 2 U.S.C. § 431(8)(A)(i), and any money expended by such a committee must also have been done for that same purpose, id. § 431(9)(A)(i). There is no other reasonable way to read Congress’s words. For the FEC to have any role, money must be used for the “purpose”' — defined as an “objective, goal, or end,” Black’s Law Dictionary 1356 (9th ed.2009) — of “influencing” an “election for Federal office.” The inescapable corollary is the FEC has no authority over money given or spent “solely for the purpose of influencing state or local elections,” an activity “unaffected by FECA’s requirements and prohibitions.” McConnell, 540 U.S. at 122, 124 S.Ct. 619.
Here, the FEC has set aside Congress’s command that the agency’s jurisdiction be bounded by the “purpose” for which money is spent. Instead of strictly minding this jurisdictional marker, the FEC conclusively presumes a federal purpose drives any spending that might influence a federal election.[1] The question though is not whether spending influences a federal election, but whether it was spent for that reason. Otherwise, the word “purpose” becomes superfluous, a result that this court cannot accept, e.g., Reiter v. Sonotone Corp., 442 U.S. 330, 339, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979), especially for a jurisdictional provision like this one, see, e.g., N. Am. Van Lines, Inc. v. NLRB, 869 F.2d 596, 598 (D.C.Cir.1989). Under FECA, federal effects are simply not enough.[2]
Nor does labeling spending that may affect both state and federal elections as “mixed-purpose” somehow solve the FEC’s problem. Regulating on the basis of such a label still assumes there must be a federal purpose behind any spending that might influence, even tangentially, a federal campaign. Because that necessary assumption is false, these regulations remain invalid. Only after a federal purpose. — mixed or otherwise — is identified does the FEC’s power come into play. If a federal purpose can be shown, then allocation ratios like those promulgated here may well be appropriate under FECA, but just asserting that there must be a federal purpose skips the threshold jurisdictional question.[3]
*27 B.
These regulations give short shrift to the “purpose” of spending and so must be vacated. Indeed, we have already rejected the FEC’s view. Just fours years ago, in Shays v. FEC, we held FECA requires that “to qualify as ‘expenditure’ in the first place, spending must be undertaken ‘for the purpose of influencing’ a federal election” and agreed with the FEC that “time, place, and content may be critical indicia of communicative purpose.” 414 F.3d 76, 99 (D.C.Cir.2005). Though a federal
election-related intent is obvious ... in statements urging voters to “elect” or “defeat” a specified candidate or party, the same may not be true of ads identifying a federal politician but focusing on pending legislation — a proposed budget, for example, or government reform initiatives — and appearing three years before the next election. Nor is such purpose necessarily evident in statements referring, say, to a Connecticut senator but running only in San Francisco media markets.

Id.

Shays confirms what FECA says: context matters. Referencing a federal candidate “may” reveal a federal purpose, but if an ad will not be aired to her constituents or if it will run “years before the next election,” then absent some persuasive indicia of a federal purpose, a reference by itself to the candidate does not trigger FEC jurisdiction. This was the FEC’s position in Shays, and it should be the FEC’s position now. FECA’s unambiguous text requires no less.
Under the Multiple Candidate Allocation Regulation, political committees must use hard money for “[pjublic communications that refer to one or more clearly identified Federal candidates, regardless of whether there is reference to a political party, but do not refer to any clearly identified non-Federal candidates.” 11 C.F.R. § 106.6(f)(1). The rule is categorical. Even if a communication only says “Vote No on State Ballot Initiative 123 — They Waste Enough Taxes in Washington, D.C.,” merely referring (perhaps by means of a montage of grainy black-and-white photos) to United States Senators of both parties with a penchant for pork-barrel spending, the ad is per se deemed to have a federal purpose. This is true even if those big spenders hail from distant states, are not up for reelection for years, and the spot will not be shown anywhere near their voters. Whether such an ad could affect a federal race is doubtful, but the FEC goes further and says these ads always reflect a federal purpose. In an age when even pizza shops and used-car dealers invoke the stereotype of wasteful federal spending to sell their wares, the FEC’s lack of sophistication is startling.
The FEC’s approach also ignores that a state campaign may be more effective if the campaigning group can mention a federal official’s endorsement. Many federal politicians are of national stature, particularly those associated with hot button political issues. If, for example, a referen *28 dum would make it more difficult to get an abortion, a pro-choice group may trumpet a statement denouncing it from a prominent pro-choice United States senator, while a pro-life group may respond with a statement from an equally prominent pro-life senator. To say, as the FEC does, that citing these statements can only be done for the purpose of influencing federal elections is to pretend away the power of celebrity. Just as Michael J. Fox’s name might be used in commercials for a stem cell amendment because his association makes for effective politics, see Alfonso Serrano, Stem Cell Opponents To Air Celebrity Ad, CBSNews.Com, Oct. 25, 2006, http://www.cbsnews.com/stories/2006/ 10/25/politics/main2122383.shtml, an out-of-state and out-of-cycle Senator Debbie Stabenow’s endorsement might be used to support state candidates because her association makes for effective state politics, particularly to targeted demographics.[4]
The Solicitation Regulation respects Congress’s language no better. The regulation declares any donation “made by any person in response to any communication is a contribution to the person making the communication if the communication indicates that any portion of the funds received will be used to support or oppose the election of a clearly identified Federal candidate.” 11 C.F.R. § 100.57(a). This rule applies even if a solicitation’s banner headline says only a certain percentage of the donation will be used for federal activities. Hence, even if someone gives $1000 in response to a solicitation that unambiguously says 90% of what is received will be spent on local elections, the FEC asserts jurisdiction over the entire gift. If a gift is made subject to this disclaimer, how is the full $1000 given for the purpose of influencing a federal election?
The Solicitation Regulation also says “[i]f the solicitation does not refer to any clearly identified non-Federal candidates, but does refer to a political party, in addition to [a] clearly identified Federal candidate,” then the entire gift becomes subject to the FEC’s authority, id. § 100.57(b)(1), and “[i]f the solicitation refers to one or more clearly identified non-Federal candidates, in addition to [a] clearly identified Federal candidate ..., at least fifty percent (50%) of the total funds received are contributions [subject to the FEC], whether or not the solicitation refers to a political party,” id. § 100.57(b)(2). Even if the solicitation is unmistakable that the entire gift will be spent on local elections, the FEC nonetheless still claims jurisdiction over at least some of the resulting donations.
This blindingly-bright line suffers from the same flaw as the Multiple Candidate Allocation Regulation-, it assumes merely referencing a federal candidate always unmasks a purpose of influencing a federal election and assumes those who give money in response to such a solicitation also unfailingly do so for the same purpose. That’s just not true. Instead, a federal politician’s name can be used for reasons tied solely to state electioneering. Again, consider an out-of-state and out-of-cycle Senator Stabenow. If she were to say “EMILY’s List supported a Democrat like me when I was running for state office, and I’m asking you to support EMILY’s List now so it can continue to work on behalf of women who are seeking state *29 office,” then under the Solicitation Regulation, the entire amount of any donations is subject to the FEC.[5] That result conflicts with Congress’s “purpose” requirement.
Finally, the Administrative Costs Allocation Regulation is contrary to law. Under 11 C.F.R. § 106.6(c), committees must use “at least 50 percent Federal funds” for “administrative expenses, costs of generic voter drives, and costs of public communications that refer to any political party.” An obvious problem is this rule applies in odd-numbered years when there are no federal elections. If later this November EMILY’s List were to say “vote a straight Democratic ticket for the city counsel” in a broadcast in Walla Walla, Washington, no less than half of the cost would have to be expensed to a federal account, even though there is no federal race to influence. The FEC is explicit: if a communication mentions a political party, then context is irrelevant. See FEC Advisory Op. 2005-13, at 4-5 (Oct. 20, 2005) (the duty to “pay the costs of public communications that refer to a political party with at least 50 percent Federal funds does not change based on the activities of [the committee] in the particular State”).
Contrary to this regulation’s premise, moreover, certain “administrative expenses” do not always reflect a federal purpose, mixed or otherwise. A committee, for example, that opposes human cloning (and thus supports many different state and federal candidates and laws throughout the nation) may launch an outpost in a state that is considering an anti-cloning measure and organize a voter drive there,[6] even though the group has no intention of participating in any federal election. By this regulation, a full half of the costs must be expensed to the committee’s federal account. In fact, the FEC would require the committee to use hard money for a leaflet that says “both Democrats and Republicans” endorse the initiative. Such a leaflet is not “generic party advertising,” McConnell, 540 U.S. at 123, 124 S.Ct. 619; it is an ad for a state ballot initiative, not a political party, and it defies reason to say otherwise.[7] FECA does not require this absurdity.
The court says EMILYs List has waived part of its statutory claim. First, my colleagues concede EMILY’s List has challenged every other subpart of these regulations, and agree the FEC has exceeded its statutory powers, but say be *30 cause EMILY’s List only mentions “administrative expenses” in one section of its brief, it waives its argument about “costs of generic voter drives” and “costs of public communications that refer to any political party.” 11 C.F.R. § 106.6(c). This is so even though the clauses are in the exact same sentence of the exact same regulation, and even though they violate the ex-' act same section of FECA for the exact same reason. This is perplexing. EMILY’s List comprehensively says “[n]or are the regulations permitted by FECA. FECA was passed to regulate contributions and expenditures made with ‘the purpose of influencing any election for Federal office.’ ” EMILY’s List Br. at 17 (emphasis added). And if there is any doubt, EMILY’s List opens its reply brief by saying “[t]he regulations at issue in this case violate the First Amendment, Chevron[], and the Administrative Procedure Act.” EMILY’s List Reply Br. at 1 (emphasis added). EMILY’s List also contends § 106.6(c) requires using hard money for ads that state “both Democrats and Republicans” support a measure. Id. at 16. It goes without saying that EMILY’s List never argues “the regulations all violate FECA, except for the second and third clauses in the second sentence of 11 C.F.R. § 106.6(c).”[8]
Second and even more perplexingly, in order to buttress its waiver argument, the same judges that read McConnell narrowly as a case that “views political parties as different in kind than independent expenditure committees,” Maj. Op. at 14, concludes EMILY’s List could not have suecessfully challenged § 106.6(c)’s regulation of generic activities on statutory grounds because McConnell specifically approved regulation of contribution and expenditure limits for these funds. Id. at 23. If this were correct, it would mean the FEC can constitutionally regulate a committee like EMILY’s List, and the court’s constitutional analysis is critically undermined.
C.
No one disputes the FEC can craft bright-line rules. An “objective test,” Orloski v. FEC, 795 F.2d 156, 162 (D.C.Cir. 1986), in fact, may be constitutionally required, see FEC v. Wis. Right to Life, Inc., 551 U.S. 449, 467-69, 127 S.Ct. 2652, 168 L.Ed.2d 329 (2007) (opinion of Roberts, C.J.). Communications calling for the election or defeat of federal candidates certainly fall within the agency’s authority, and the FEC may have a bit more leeway to regulate ads directed at federal electorates or aired during federal elections. Shays, 414 F.3d at 99. FECA’s unambiguous text, however, forbids the Commission from doing what it has done here: promulgating proxies for “purpose” that wholly ignore all relevant contextual clues. The regulations consequently must be vacated as contrary to congressional will.
II.
A.
Because this ease can be decided on statutory grounds, we need not reach the *31 constitutional question, and so should not reach the constitutional question. Our precedent is not wishy-washy: “Federal courts should not decide constitutional questions unless it is necessary to do so. Before reaching a constitutional question, a federal court should therefore consider whether there is a nonconstitutional ground for deciding the case, and if there is, dispose of the case on that ground.” Kalka v. Hawk, 215 F.3d 90, 97 (D.C.Cir. 2000). See also Meredith Corp. v. FCC, 809 F.2d 863, 870 (D.C.Cir.1987); United States v. Thomas, 572 F.3d 945, 952 (D.C.Cir.2009) (Ginsburg, J., concurring in part). My colleagues duck this rule, preferring to summon the awesome power of Marbury v. Madison. But in their eagerness to play John Marshall, they do not follow him. The Great Chief Justice himself cautioned: “No questions can be brought before a judicial tribunal of greater delicacy than those which involve the constitutionality of a legislative act. If they become indispensably necessary to the case, the court must meet and decide them,” but if not, “a just respect for the legislature requires, that the obligation of its laws should not be unnecessarily and wantonly assailed.” Ex parte Randolph, 20 F. Cas. 242, 254 (C.C.D.Va.1833) (No. 11,558).
The reasons to be “keenly mindful of our institutional role” and “fully appreciate” the solemnity of constitutional adjudication are obvious. Nw. Austin Mun. Util. Dist. No. One v. Holder, — U.S. -, 129 S.Ct. 2504, 2513, 174 L.Ed.2d 140 (2009). Meekness, for one, compels us to recognize we are not the Constitution’s only Mend— each branch swears an oath to uphold it. See U.S. Const. art. II, § 1, cl. 8; Rostker v. Goldberg, 453 U.S. 57, 64, 101 S.Ct. 2646, 69 L.Ed.2d 478 (1981). And if we misread a statute, Congress can fix it; not so with the Constitution.
The court, however, is not content just answering a gratuitous constitutional question. Its holding is broader than even the plaintiff requests. Instead of arguing nonprofits have a constitutional right to pay for ads attacking federal candidates with soft money, EMILY’s List more modestly challenges the regulations as the “functional equivalent of spending limits, prohibiting EMILY’s List from supporting state and local candidates in certain ways when its federal funds are exhausted” and claims they are not properly tailored because they “restrict vast amounts of nonfederal activity.” EMILY’s List Br. at 17 (summary of argument) (emphasis added). The court holds, nonetheless, that EMILY’s List is constitutionally entitled to pay 100% of the costs of its advertisements out of a soft-money account, even for ads that attack or promote federal candidates. Maj. Op. at 17.[9]
Because EMILY’s List’s actual claims are not bold enough, the court sua sponte spins a more aggressive argument — making its waiver charge all the more curious. Nowhere does any party refer to Justice Blackmun’s separate opinion in California Medical Association v. FEC, 453 U.S. 182, 101 S.Ct. 2712, 69 L.Ed.2d 567 (1981) *32 (“Cal-Med”). Nor does EMILY’s List mention FEC v. National Conservative PAC, 470 U.S. 480, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985) (“NCPAC”), FEC v. Massachusetts Citizens for Life, Inc., 479 U.S. 238, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986) (“MCFL”), or North Carolina Right to Life, Inc. v. Leake, 525 F.3d 274 (4th Cir.2008) — in other words, the eases upon which the court’s holding depends, see, e.g., Maj. Op. at 8-11, 14, 16.[10] None of the law review articles the court relies on are cited — much less discussed' — either.[11] And far from hashing out McConnell’s “footnote 48,” id. at 14-15 n. 13, neither party mentions it. The court today issues an expansive constitutional decision without the benefit of on-point briefing. Before deciding a complicated First Amendment issue, we ought to ask for the parties’ views.
In attempting to connect its decision to the parties’ views, the court artfully re-imagines the “key question in this case,” describing it as whether “non-profits [are] more like individual citizens (who under Buckley have the right to spend unlimited money ...) or more like political parties (which under McConnell do not).” Maj. Op. at 23. The court notes “CaV-Med was cited and discussed often in the briefs and at oral argument.” Id. at 23. Cal-Med was cited and discussed by the parties, but never to support the proposition for which the court now relies on it. For instance, when asked by the court to respond to the FEC’s reliance on CaV-Med, counsel for EMILY’s List offered this succinct critique of the court’s holding:
The Court: Can you deal with [FEC’s counsel’s] response on [CaV-MedJ!
EMILY’s List: Yes. I mean, Cal[-]Med is mysteriously produced here for the FEC’s position. Cal[-]Med didn’t raise any of the issues in this case. Cal[-]Med was a simple question of whether a committee that was making contributions to federal candidates had to observe a limit on contributions made to that federal program. That set a law now, that’s certainly what EMILY’s List does. I don’t think it bears at all on this invasion of our state and local programs through the promulgation of these excessive federal regulatory schemes.
Tr. of Oral Arg. at 32-33. How true.
But even if it were judicially proper for me to do so, and even if the issues were briefed, I doubt I could join the court’s opinion in full. This is not because I dislike its outcome. Indeed, I ■ agree .with what seems to be the unstated premise: if the Supreme Court’s cases made any sense, the First Amendment would protect much more than pornography, profanity, *33 and pyrotechnics. See United States v. Playboy Entm’t Group, Inc., 529 U.S. 803, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000); Cohen v. California, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971); Texas v. Johnson, 491 U.S. 397, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989). The amendment’s “purpose,” after all, is “to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail,” FCC v. League of Women Voters, 468 U.S. 364, 377, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984) — a principle that “has its fullest and most urgent application to speech uttered during a campaign for political office,” Eu v. S.F. County Democratic Cent. Comm., 489 U.S. 214, 223, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989). If those beautifully fierce words “Congress shall make no law” are to do anything but condemn our constitutionalism as a failed experiment, then at least political speech in all its forms should be free of government constraint.
My colleagues’ distaste for the FEC’s handiwork is to their credit. It shows they take the First Amendment seriously. And they are right, of course, that if constitutional law were better acquainted with the Constitution, regulations such as these would never survive Article III scrutiny. If an advertisement criticizes the President of the United States, the Speaker of the House of Representatives, or the Chair of the Senate Committee on Foreign Relations, it can be a felony punishable by up to five years in prison to pay for that ad using money the federal government doesn’t know about or that comes from sources the federal government deems to have already given enough. See 2 U.S.C. § 437g(d). The First Amendment, logically construed, cannot condone such a weighty burden on political speech at the same time it forbids penalizing the production of “virtual child pornography,” Ashcroft v. Free Speech Coal., 535 U.S. 234, 122 S.Ct. 1389, 152 L.Ed.2d 403 (2002).
I also agree with the court that “corruption” should only be understood in terms of quid pro quo — not a free-floating unease about money in politics. Once “corruption” is disconnected from “pay to play,” Congress has carte blanche to stifle speech, a license that is particularly pernicious as our overweening government ever enlarges itself. Power — government power — is what generates passion in politics. Money only measures its depth. The more power is at stake, the more money will be used to shield, deflect, or co-opt it. So long as the government can take and redistribute a man’s livelihood, there will always be money in politics. One man’s corruption is another man’s political accountability.
But there is a rub. We sit on a lower court and “must follow the binding Supreme Court precedent” until the Court itself overrules it. We the People Found., Inc. v. United States, 485 F.3d 140, 144 (D.C.Cir.2007). Though we do not read the court above’s precedent unduly expansively, we also do not drag our feet: “it is not our role to fight a rearguard action” against the logical implications of the Court’s cases. United States v. Gardelliny 545 F.3d 1089, 1096 (D.C.Cir.2008). Instead, we take its holdings as we find them, applying them to cover all they fairly address. Stare decisis means nothing if we only are bound by those cases with which we already agree. Like it or not, we cannot ignore Supreme Court precedent.
Modesty is dictated by the difficulty of applying McConnell’s facial generalizations to real world events. It is hard to say exactly how contribution limits on hybrid committees, like EMILY’S List, should be analyzed after McConnell. McConnell involved a wide-ranging facial challenge addressing the constitutionality of BCRA. *34 Trying to extrapolate from that case to this one is risky and reason enough to avoid the constitutional bog. Suffice it to say that the Supreme Court majority, the dissenters, and the commentators all have read McConnell as a maximalist opinion. See 540 U.S. at 192-93, 124 S.Ct. 619 (“[Ojur decisions in Buckley and MCFL were specific to the statutory language before us; they in no way drew a constitutional boundary that forever fixed the permissible scope of provisions regulating campaign-related speech.”); id. at 263, 107 S.Ct. 616 (Scalia, J., dissenting) (“We have witnessed merely the second scene of Act I of what promises to be a lengthy tragedy.”); id. at 264, 107 S.Ct. 616 (Thomas, J., dissenting) (“[T]he Court today upholds what can only be described as the most significant abridgment of the freedoms of speech and association since the Civil War.”); id. at 294, 124 S.Ct. 619 (Kennedy, J., dissenting) (“This new definition of corruption sweeps away all protections for speech that lie in its path.”); id. at 357, 124 S.Ct. 619 (Rehnquist, C.J., dissenting) (“Today’s decision, by not requiring tailored restrictions, has significantly reduced the protection for political speech having little or nothing to do with corruption or the appearance of corruption.”); see also Richard Briffault, The 527 Problem ... and the Buckley Problem, 73 Geo. Wash. L.Rev. 949, 970 (2005) (“McConnell, however, transformed the constitutional landscape.”).
In both holding and discussion, the McConnell Court sided with the censor, going so far as to rely on theoretical anticipation to uphold a speech restriction, see 540 U.S. at 185, 124 S.Ct. 619 (upholding BCRA § 323(f), which forbids state and local officeholders and candidates from using soft money to support or attack federal candidates, based on the “eminently reasonable prediction that ... state and local candidates and officeholders will become the next conduits for the soft-money funding of sham issue advertising”), and ending with an invitation for even more congressional action, id. at 224, 124 S.Ct. 619 (“We are under no illusion that BCRA will be the last congressional statement on the matter.”). This is not the modus operandi of a tentative tribunal; the Court knew what it was doing, and said so. After McConnell, if these regulations are within the FEC’s statutory power, then there is no obvious reason they facially violate the First Amendment.[12]
It is true McConnell upheld, against an equal protection challenge, a provision of BCRA regulating political parties. But regulation of political parties is not McConnell’s theme. The Court broadly recognized and deferred to governmental interests in preventing corruption, the appearance of corruption, and circumvention of election regulations. McConnell, 540 U.S. at 136-37, 143-45, 152-53, 124 S.Ct. 619. Arguably, this expansive corruption/circumvention/conduit rationale is broad enough to encompass some limits on independent expenditure committees, particularly for those political committees *35 with a self-proclaimed electoral mission. See Briffault, 73 Geo. Wash. L.Rev. at 986-87; Hasen, 153 U. Pa. L.Rev. at 67-68. EMILY’s List is a multicandidate political committee that has as its primary purpose electing ideologically compatible candidates, EMILY’s List Br. at 3.[13] As such, it supports Democratic candidates for federal office. See Matthew B. Stannard, Cash is Key for Tauscher’s Replacement, S.F. Chron., Aug. 24, 2009, at A1, available at 2009 WLNR 16474721 (noting that a candidate in a federal primary race “has touted the endorsement of EMILY’s List, a national fundraising organization that supported [former U.S. Representative Ellen Tauscher] and backs Democratic women who support abortion rights”). Thus, EMILY’s List is much more like a political party than the Sierra Club or the Society for the Prevention of Cruelty to Animals.
Whether, under the high court’s current precedents, EMILY’s List could be regulated exactly like a political party is unknown. That it should not be regulated more harshly than a political party seems to be the committee’s complaint with the FEC regulations challenged in this court. EMILY’s List Br. at 39 (“Bizarrely, [the regulation] also treats nonparty PACs more harshly than any other type of committee, save national parties and candidates themselves.”). My point is not that McConnell mandates such treatment; only that nothing in the opinion’s logic clearly precludes it. The court does not think this is “a persuasive interpretation of McConnell.” Maj. Op. at 22. Perhaps the court is right. But reading the case, as the court does, to sanction First Amendment immunity for all non-connected nonprofits seems even more implausible.
B.
Precedent holds allocation and solicitation rules are contribution limits. This is key, as such limits receive less than “strict scrutiny,” given they “ ‘entail only a marginal restriction upon the contributor’s ability to engage in free-communication.’ ” McConnell, 540 U.S. at 134-35, 124 S.Ct. 619 (quoting Buckley, 424 U.S. at 20, 96 S.Ct. 612). The “ ‘overall effect’ of dollar limits on contributions is [also] ‘merely to require candidates and political committees to raise funds from a greater number of persons.’” Id. at 136, 124 S.Ct. 619 (quoting Buckley, 424 U.S. at 21-22, 96 S.Ct. 612). Unlike strict scrutiny, which requires narrow tailoring to serve compelling governmental interests, a contribution limit is “valid [if] it satisfies the lesser demand of being closely drawn to match a sufficiently important interest.” Id.
After McConnell, allocation and solicitation rules are subject only to this lesser scrutiny. Facing BCRA § 323(a), which forbids national parties from soliciting and spending soft money, and § 323(b), which forbids state parties from spending soft money on “federal election activities,” the Court declined to apply strict scrutiny. 540 U.S. at 138-39, 124 S.Ct. 619. The Court held “neither provision in any way limits the total amount of money parties can spend. Rather, they simply limit the source and individual amount of donations. That they do so by prohibiting the spending of soft money does not render them expenditure limitations.” Id. at 139, 124 S.Ct. 619. We instead ask “whether the mechanism adopted to implement the contribution limit, or to prevent circumvention *36 of that limit, burdens speech in a way that a direct restriction on the contribution itself would not.” Id. at 138-39, 124 S.Ct. 619. Using the Court’s standard, I agree with the district court that while the FEC’s regulations “may affect the manner in which EMILY’s List must fund the speech in which it chooses to engage, they do not in any way limit the political speech that EMILY’s List may undertake.” EMILY’S List, 569 F.Supp.2d at 39.
The issue we confront then is whether these regulations, facially, are closely drawn to match an important interest. To answer, we again ought to look to McConnell. In upholding BCRA § 323, the Court noted the “interests that underlie contribution limits — interests in preventing both the actual corruption threatened by large financial contributions and the eroding of public confidence in the electoral process through the appearance of corruption.” McConnell, 540 U.S. at 136, 124 S.Ct. 619. The Court bluntly held these interests are “not limited ... to the elimination of cash-for-vote exchanges,” but “extend to the broader threat from politicians too compliant with the wishes of large contributors.” Id. at 143, 124 S.Ct. 619. Congress must be able to “address [these] more subtle but equally dispiriting forms of corruption” by “removing] the temptation” of “large financial contributions.” Id. at 153, 124 S.Ct. 619. To combat “cynical assumption[s],” Congress can “regulate the appearance of undue influence,” with “undue influence” defined as “a sense of obligation” or “grat[itude],” id. at 144-45, 124 S.Ct. 619. Importantly, Congress also has an interest in preventing the circumvention of these limits — and so can use broad prophylaxes — because “candidates, donors, and parties test the limits of the current law.” Id. at 144, 124 S.Ct. 619. In sum, McConnell defines the “interest” so broadly it is hard to imagine regulations that are not properly drawn to it. See id. at 356-57, 124 S.Ct. 619 (Rehnquist, C.J., dissenting).
Following from such an encompassing statement of the interest, the McConnell Court facially upheld many onerous restrictions on the use of soft money. The Court emphasized, for example, that even a complete ban on soliciting nonfederal funds would still “leave open ample opportunities for soliciting federal funds,” and noted such restrictions “increase the dissemination of information by forcing parties, candidates, and officeholders to solicit from a wider array of potential donors.” Id. at 139-40, 124 S.Ct.' 619. The Court also upheld a ban on any use of soft money by national parties, even for those “minor parties” that are unlikely to have any tangible electoral success, remarking only that “a nascent or struggling minor party can bring an as-applied challenge if § 323(a) prevents it from amassing the resources necessary for effective advocacy.” Id. at 159, 124 S.Ct. 619. While national parties do not always act on behalf of or in concert with federal candidates, a prophylactic prohibition on any soft money spending and soliciting by them is facially valid, given the “close connection and alignment of interests” between national parties and federal candidates. Id. at 155, 124 S.Ct. 619.
The Court’s discussion of national parties by itself raises difficulties for the court, especially because the Court already seemingly has held there is a “close connection and alignment of interests” between committees like EMILY’s List and federal candidates. In Cal-Med, the Court sustained contribution limits to multicandidate committees. Four justices adopted the Conference Report’s conclusion that these committees may “ ‘appear to be separate entities pursuing their own ends, but are actually a means for advancing a candidate’s campaign,’ ” 453 U.S. at *37 199 n. 18, 101 S.Ct. 2712 (plurality opinion) (quoting H.R. Conf. Rep. No. 94-1057, pp. 57-58 (1976), U.S.Code Cong. & Admin. News 1976, pp. 946, 972-74). Justice Blackmun penned a concurring opinion, but did not disclaim the Conference Report or disagree with the Court’s ultimate holding. In fact, he expressly said “contributions to multicandidate committees may be limited to $5,000 per year as a means of preventing evasion [of contribution limits],” though he noted in dicta that his conclusion would be different if the committee “makes only independent expenditures” and so does not “pose a perceived threat of actual or potential corruption.” Id. at 203, 101 S.Ct. 2712 (opinion of Blackmun, J.) (emphasis added). If Congress can forbid all allocation and solicitation of soft money by national parties, how is it unconstitutional to forbid only some allocation and solicitation of soft money by multicandidate committees that are also closely aligned with federal candidates?
The court disputes this reading of CalMed, claiming there are not just two types of political committees (ones that only make independent expenditures, and all others), but actually three: (1) those that only make independent expenditures; (2) those that only contribute to candidates; and (3) those that make independent expenditures and contribute to candidates. Such political committees are, in the court’s view, entitled to raise and spend “unlimited money” for advertisements, get-out-the-vote efforts, and voter registration drives. Maj. Op. at 16. If these hybrid committees contribute to federal candidates, they must use hard money, says the court, but all other spending can be with soft money.
This novel argument is not without considerable charm, but one must read CalMed with a squint to see that holding.[14] There is no indication in Cal-Med that the committee did not make independent expenditures, but the Court still sustained the statute, without announcing the distinction the court draws today. The Court has consistently cited Cal-Med for the unqualified proposition that it is constitutional to limit contributions to multicandidate committees. See, e.g., FEC v. Colo. Republican Fed. Campaign Comm., 533 U.S. 431, 441-42, 121 S.Ct. 2351, 150 L.Ed.2d 461 (2001); FEC v. NRA Political Victory Fund, 513 U.S. 88, 97, 115 S.Ct. 537, 130 L.Ed.2d 439 (1994). See also Buckley, 424 U.S. at 38, 96 S.Ct. 612.
The infamous “footnote 48 of the McConnell opinion,” Maj. Op. at 14 n. 13, also flatly contradicts the court:
Justice Kennedy’s contention that Buckley limits Congress to regulating contri *38 buttons to a candidate ignores Buckley itself. There, we upheld FECA’s $25,000 limit on aggregate yearly contributions to candidates, political committees, and party committees out of recognition that FECA’s $1,000 limit on candidate contributions would be meaningless if individuals could instead make “huge contributions to the candidate’s political party.” Likewise, in [Calr-Med], we upheld FECA’s $5,000 limit on contributions to multicandidate political committees. It is no answer to say that such limits were justified as a means of preventing individuals from using parties and political committees as passthroughs to circumvent FECA’s $1,000 limit on individual contributions to candidates. Given FECA’s definition of “contribution,” the $5,000 and $25,000 limits restricted not only the source and amount of funds available to parties and political committees to make candidate contributions, but also the source and amount of funds available to engage in express advocacy and numerous other noncoordinated expenditures. If indeed the First Amendment prohibited Congress from regulating contributions to fund the latter, the otherwise-easy-to-remedy exploitation of parties as passthroughs (e.g., a strict limit on donations that could be used to fund candidate contributions) would have provided insufficient justification for such over-broad legislation.
McConnell, 540 U.S. at 152 n. 48, 124 S.Ct. 619.
That the Court may have created a doctrinal anomaly might suggest, as the court argues, see Maj. Op. at 14-15 n. 13, that it could not possibly have meant what it said, but that is a hard argument to make. Often cases are in tension as doctrine works itself pure. Our duty as an intermediate court is not to tell the Court what it ought to have said, but to abide by what it did say.
But even leaving aside its treatment of national parties, McConnell further undermines the court. Recognizing the dynamic — indeed, Sisyphean — character of campaign finance law, the Court noted “[mjoney, like water, will always find an outlet.” 540 U.S. at 224, 124 S.Ct. 619. Upon realizing structural forces inherent in a republic inevitably create incentives for those subject to regulation to petition for relief and to campaign against those who are disinclined to grant it, the Court did not retreat to a more manageable and less burdensome “quid pro quo” standard. Id. at 296, 124 S.Ct. 619 (Kennedy, J., dissenting). Instead, after upholding § 323(a), the Court emphasized money would now “corrupt” federal races by other, more subtle routes, so Congress, in anticipation of this new corruption, can enact broad anti-circumvention measures. E.g., id. at 165-66, 124 S.Ct. 619. Indeed, without pointing to any evidence that local officials (e.g., county assessors) are connected to federal candidates (e.g., for President of the United States) or have been used to circumvent the law, the Court held Congress prophylaetically can regulate them without facially offending the Constitution. See id. at 184-85, 124 S.Ct. 619. If the First Amendment is flexible enough to allow regulating local officials because contributions might flow through them to federal candidates, then why can’t the FEC also make an “eminently reasonable prediction” that committees like EMILY’s List — which actually do campaign for candidates and give them money[15] — will be the next route for *39 corruption, and regulate accordingly? Id. at 185, 124 S.Ct. 619.
The court sidesteps McConnell by saying EMILY’s List is a nonprofit, not a political party, and so has more constitutional rights.[16] But EMILTs List is not just a nonprofit; it is a multicandidate political committee that campaigns for and contributes money to federal candidates. In upholding § 323 in full, including § 323(f), McConnell blessed restrictions on local officeholders, who are not, of course, political parties. The rule then cannot be that parties and federal candidates are in one column, and everyone else is in another, because that does not explain McConnell. Instead, there is a spectrum, N.C. Right to Life, 525 F.3d at 291, so we should ask not whether an entity is a nonprofit, but instead where it falls on the spectrum. Specifically, is EMILY’s List more or less likely than a local official to act as a conduit to federal candidates? “Common sense” says such committees are the more natural path to “corruption,” McConnell, 540 U.S. at 297, 124 S.Ct. 619 (Kennedy, J., dissenting), but if my colleagues are correct, Congress cannot regulate them the same way it regulates county directors of animal control.[17] Precedent is plain: local officials must use hard money to attack federal candidates, see id. at 184-85, 124 S.Ct. 619, but as the court now resolves this case, multicandidate political committees cannot be so limited. Can that be right?
The court’s opinion is boldly creative, and will, if followed, have profound results on campaign finance regulation. This case means:
1. Multicandidate political committees can spend unlimited amounts of soft money to run ads attacking or supporting federal candidates and political parties.
2. These committees can spend unlimited amounts of soft money on get-out-the-vote activities that support federal candidates and political parties.
3. These committees can solicit soft money by saying: “Just like you, we want [federal candidate] to win. You have already donated all the law allows to [federal candidate], but there is no limit on how much you can give to us to support [federal candidate].”
4. Congress can do nothing about any of this.
These results are in tension — -perhaps irreconcilable tension — -with McConnell.
C.
Recall how the Court in McConnell concluded its opinion: “ ‘To say that Congress is without power to pass appropriate legislation to safeguard an election from the improper use of money to influence the result is to deny the nation in a vital particular the power of self protection.’ ” *40 540 U.S. at 223-24, 124 S.Ct. 619 (quoting Burroughs v. United States, 290 U.S. 534, 545, 54 S.Ct. 287, 78 L.Ed. 484 (1934)). This “conviction” compelled the Court to uphold “Congress’s most recent effort to confíne the ill effects of aggregated wealth on our political system” by “controlling] ... soft money.” Id. at 224, 124 S.Ct. 619. But the Court was “under no illusion that BCRA will be the last congressional statement on the matter”- — -“[mjoney, like water, will always find an outlet.” Id.
While I have argued courts should not unnecessarily assail legislative acts, political speech is the core of what the First Amendment protects. From Buckley to McConnell the Court has relied on an ad hoc empiricism ill-suited to the complex interactions of democratic politics. The government has unlimited resources, public and private, for touting its policy agenda. Those on the outside- — whether voices of opposition, encouragement, or innovation — must rely on private wealth to make their voices heard. An increasingly anomalous campaign finance jurisprudence only impoverishes this essential debate. McConnell’s careless invocation of access and influence (two integral aspects of political participation) as synonyms for corruption is instructive. Such an expansive, self-referential, and amorphous definition of corruption, coupled with lax standards of scrutiny and a willingness to accept as “evidence” any plausible theory of corruption or claim of circumvention, is likely to doom any argument for protection of core political speech. Someday the Supreme Court may be persuaded to reconsider this approach. But that cannot be our task.
This should have been a straightforward application of administrative law, not unlike countless agency cases decided by this circuit every year. Congress has- enacted a statute; the agency has violated it; the rules must be vacated; done. I would enforce the statute as written and call it a day. A good rule of thumb is we often do more for the law when we do less with the law. Per that rule, I concur only in part with the court’s opinion.

. See, e.g., Political Committee Status, Definition of Contribution, and Allocation for Separate Segregated Funds and Nonconnected Committees, 69 Fed.Reg. 68,056, 68, 062 (Nov. 23, 2004) (Final Rules) ("[References solely to a political party inherently influence both Federal and non-Federal elections.”).

. Cf. 42 U.S.C. § 1973c (under the Voting Rights Act, certain jurisdictions cannot alter their voting procedures without showing the change "neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color” (emphasis added)).

. It is also no defense to say that under Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), everything political committees do reflects federal purposes. See EM *27 ILY’s List v. FEC, 569 F.Supp.2d 18, 44 (D.D.C.2008) ("EMILY’S List is undoubtedly correct that its status as a political committee does not automatically give the FEC authority to regulate its legitimately nonfederal election activities."). In Buckley, the Court explained "[ejxpenditures of ... 'political committees’ ... can be assumed to fall within the core area sought to be addressed by Congress.” 424 U.S. at 79, 96 S.Ct. 612. This "assumfption],” however, is rebutted when it is unreasonable to posit a federal purpose. See Akins v. FEC, 101 F.3d 731, 742 (D.C.Cir. 1996) (en banc) rac'd, on other grounds 524 U.S. 1, 118 S.Ct. 1772, 141 L.Ed.2d 1 (1998) (Buckley only ”creat[es] a presumption” of a federal purpose).

. "[R]eferring to Senator Stabenow might well inspire recipients outside of her home state to contribute to her campaign, and thus influence her federal election, or might otherwise raise her national profile and ultimately influence her election,” EMILY’s List, 569 F.Supp.2d. at 48, but if such speculative brainstorming can satisfy FECA’s "purpose” requirement, there is no “purpose” requirement.

. My hypothetical is similar to one EMILY's List posed to the FEC, with the only material difference being the inclusion of a party label. While the FEC said EMILY's List’s solicitation was fine, see FEC Advisory Op. 2005-13, at 5-6 (Oct. 20, 2005), it could not have said the same for mine: including "Democrat”— an important label in state politics too— causes the gift to be hard money.

. A "generic voter drive” includes "any ... activities that urge the general public to ... support candidates ... associated with a particular issue, without mentioning a specific candidate.” 11 C.F.R. § 106.6(b)(l)(iii) (emphasis added). Thus, if a committee says "support candidates for the General Assembly who oppose human cloning” in an odd-numbered year, hard money is required.

. "Generic party advertising” is not in the United States Code or the Code of Federal Regulations. It was used by the McConnell district court to mean, naturally, ads that support a party. See 251 F.Supp.2d 176, 199 (D.D.C.2003) (per curiam) ("[N]ational parties expended $14 million in nonfederal funds for 'generic' party advertising, consisting predominantly of television advertisements that did not mention candidates names, but urged viewers to simply vote for a particular party or stressed themes from the presidential campaigns.”); id. at 1994 (separate opinion of Kollar-Kotelly, J.) ("generic party advertising (that is, ‘Vote Republican!')”).

. Even if we assume EMILY's List has inadequately raised this issue, waiver is a prudential doctrine — not jurisdictional. E.g., Mitchell v. Fishbein, 377 F.3d 157, 164-65 (2d Cir.2004). And though my colleagues are mistaken on waiver, if they were truly concerned about this, we could order additional briefing. E.g., U.S. Nat'l Bank v. Indep. Ins. Agents of Am., Inc., 508 U.S. 439, 444-48, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993) (holding the D.C. Circuit did not err in ordering supplemental briefing on a subject not raised because "when an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law”).

. Consistent with its briefing, during oral argument counsel for EMILY's List was more circumspect than the court is today:
The Court: Would your position preclude say regulation of get out the vote drives, or voter registration, or that sort of thing? Do you think that would be beyond the FEC's purview?
EMILY’s List: No, Your Honor, we don’t take that position, we take the position that reasonable regulations to account for the federal election related impact of that activity are permissible.
Tr. of Oral Arg. at 9. Cf. Maj. Op. at 16 (”[N]on-profits are constitutionally entitled to pay 100% of the costs of such voter drive activities out of their soft-money accounts.”).

. In fact, EMILY’s List does not mention Cal-Med until its reply brief, and neither party cites Cal-Med for a proposition integral to the court's holding. EMILY’s List does cite, once, as a “see also,” Citizens Against Rent Control v. City of Berkeley, 454 U.S. 290, 102 S.Ct. 434, 70 L.Ed.2d 492 (1981), but for a background principle. EMILY’s List Br. at 23-24. The FEC cites MCFL in a footnote for an immaterial point, FEC Br. at 23 n. 17, but does not mention NCPAC, Citizens Against Rent Control, or North Carolina Right to Life.

. Many of the articles do not support the court, and not one squarely does. E.g., Edward B. Foley, The “Major Purpose" Test: Distinguishing Between Election-Focused and Issue-Focused Groups, 31 N. Ky L.Rev. 341, 344 (2004) ("[I]n my judgment contributions to political committees should be classified under the First Amendment with contributions to political parties....”); Richard L. Hasen, Buckley is Dead, Long Live Buckley, 153 U. Pa. L.Rev. 31, 72 (2004) (explaining that because of the “considerable deference” it displayed, “[ljower courts showing fidelity to McConnell will have a difficult time striking down most campaign finance regulation”).

. This a facial challenge. For such claims, "exercising judicial restraint ... frees the Court not only from unnecessary pronouncement on constitutional issues, but also from premature interpretations of statutes in areas where their constitutional application might be cloudy.” Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 128 S.Ct. 1184, 1190-91, 170 L.Ed.2d 151 (2008). As a rule, a law is facially repugnant only if it
"is unconstitutional in all of its applications,” but there is a narrow First Amendment exception where "a law may be overturned [if] a substantial number of its applications are unconstitutional, judged in relation to the statute’s plainly legitimate sweep,” id. at 1191 n. 6. Those seeking this "strong medicine,” id., however, face a "heavy burden,” McConnell, 540 U.S. at 207, 124 S.Ct. 619.

. In defining ils mission, EMILY's List explains that it "is committed to a three-pronged strategy to elect pro-choice Democratic women: recruiting and funding viable women candidates; helping them build and run effective campaign organizations; and mobilizing women voters to help elect progressive candidates across the nation.” EMILY's List, Our Mission, http://emilyslist.org/ about/mission/ (last visited Aug. 28, 2009).

. The court relies heavily on Justice Black-mun's concurring opinion in Cal-Med, arguing that it is controlling. But the opinion is controlling, if at all, only for "points that can be said to be fairly subsumed within the reasoning of the plurality.” John C. Eastman, Strictly Scrutinizing Campaign Finance Restrictions (and the Courts that Judge Them), 50 Cath. U.L. Rev. 13, 37 (2000); see Marks v. United States, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977). This circuit has clarified it is only the narrowest opinion's overlap with the broader opinion that counts. "Marks is workable — one opinion can be meaningfully regarded as 'narrower' than another — only when one opinion is a logical subset of other, broader opinions. In essence, the narrowest opinion must represent a common denominator of the Court’s reasoning; it must embody a position implicitly approved by at least five Justices who support the judgment.” King v. Palmer, 950 F.2d 771, 781 (D.C.Cir.1991) (en banc). Presumably then, the controlling part of Justice Black-mun's opinion is the holding that the FEC may constitutionally regulate contributions to fund independent political expenditures without contravening the First Amendment — no more and no less.

. Britt Cocanour, EMILY’s List Chief of Staff, avowed her committee "has helped to elect sixty-eight Democratic women to Congress, thirteen to the U.S. Senate, eight to *39 governorships, and over 350 to other state and local offices.” Joint Appendix at 70.

. The court suggests McConnell guarantees " 'interest groups' ” the right " 'to raise soft money to fund voter registration, GOTV activities, mailings,’ and advertising.” Maj. Op. at 14 (quoting 540 U.S. at 187, 124 S.Ct. 619). But McConnell only notes BCRA can treat interest groups differently than parties without violating Due Process. See 540 U.S. at 188, 124 S.Ct. 619. There is a difference between noting Congress has not regulated and holding Congress cannot regulate. See N.C. Right to Life, 525 F.3d at 333-34 (Michael, J., dissenting) (discussing McConnell’s reference to "interest groups”).

. Though these regulations go further than BCRA § 323(0, by the court's opinion, it would not matter if they were exactly the same: nonprofits are categorically distinct. See Maj. Op. at 14.